**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Trelevate LLC, | No. CV-19-05171-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Dumont Aviation Group Incorporated, | |
| Defendant. | |

## INTRODUCTION

In August 2019, Plaintiff Trelevate LLC ("Trelevate") and Defendant Dumont Aviation Group, Inc. ("Dumont") executed a settlement agreement in an effort to terminate their business relationship. The settlement agreement called for Dumont to make a one-time payment of $170,500 to Trelevate. When Dumont failed to make that payment, Trelevate brought this action. Afterward, the parties largely declined to engage in discovery—no depositions were held and only a handful of interrogatories were propounded.

Now pending before the Court is Trelevate's motion for summary judgment. (Doc. 35.) The motion is fully briefed and nobody has requested oral argument. For the following reasons, the motion will be granted.

…

…

…

**BACKGROUND**

I.    Factual Background

    A.    **The Underlying Agreements**

Dumont is a Delaware-based aviation business that, among other things, sells private charter flights.  (Doc. 44 ¶ 2.)

On March 18, 2019, Trelevate and Dumont executed a mutual non-disclosure and non-solicitation agreement ("the NDNS").  (Doc. 42 at 19-22; Doc. 44 ¶ 3.)  The purpose of the NDNS was "to maintain the confidentiality of [Dumont's] proprietary customer and prospective customer lists and related information."  (Doc. 44 ¶ 4.)  Among other things, the NDNS provided that Trelevate "could use the confidential information only for its work and services on behalf of [Dumont]—and for no other purpose."  (*Id.* ¶ 7.)

On April 25, 2019, Trelevate and Dumont executed a business development and marketing agreement ("the Marketing Agreement").  (Doc. 42 at 24-33; Doc. 44 ¶ 9.)

On July 16, 2019, Dumont informed Trelevate that it intended to terminate the Marketing Agreement.  (Doc. 35 at 19; Doc. 44 ¶ 13.)

    B.    **The Settlement Agreement**

On August 5, 2019, in an effort "to exit their relationship amicably," the parties executed a settlement agreement ("the Settlement Agreement").  (Doc. 35 at 19-21; Doc. 44 ¶ 14.)  It provided that, within three days, (1) Dumont would pay $170,500 to Trelevate via wire transfer and (2) Trelevate would "ship to Dumont . . . the computers, Dumont branded materials, and all other Dumont property in the possession of Trelevate" and "transition all leads of any kind generated by Trelevate or its representatives."  (Doc. 35 at 19.)  The Settlement Agreement further provided that the NDNS "shall continue in full force and effect" but the Marketing Agreement "is terminated and of no further force or effect."  (*Id.*)

    C.    **Compliance**

It is undisputed that Trelevate complied with its obligation under the Settlement Agreement to return Dumont's leads and property.  Trelevate has submitted evidence

establishing that, on August 6, 2019, it sent "[a]n Excel spreadsheet with all leads generated by Trelevate . . . to [a] Dumont representative."  (Doc. 35 at 16-17 ¶ 10.)  Additionally, "Trelevate took possession of all computers used by Trelevate's employees working on behalf of Dumont and tendered the computers, along with all Dumont property[,] to Dumont." (Doc. 35 at 16 ¶ 7.)  However, "Dumont failed and refused to provide an address to which the computers and other Dumont property (a model of Dumont airplane, a model car of the Dumont sponsored NASCAR and some pictures of Dumont airplanes) could be sent.  As a result, Trelevate still has the computers and other Dumont property stored in a box at Trelevate's office and ready for pick-up by Dumont."  (*Id.* ¶ 8.)

It is also undisputed that Dumont failed to make the $170,500 payment to Trelevate that was contemplated by the Settlement Agreement.  (Doc. 35 at 16 ¶ 6.)

As discussed *infra*, the parties' only dispute concerns whether Trelevate complied with its obligations under the NDNS.

II.    Procedural Background

On August 14, 2019—less than a week after the deadline for making the $170,500 payment had elapsed—Trelevate filed a complaint against Dumont in Maricopa County Superior Court.  (Doc. 1-2 at 11-13.)

On September 13, 2019, Dumont removed the action to this Court.   (Doc. 1.)  Thereafter, Dumont filed an amended removal notice with amended jurisdictional allegations.  (Doc. 12.)

On September 20, 2019, Dumont filed an answer and counterclaims.  (Doc. 13.)

On October 28, 2019, the Court issued the Rule 16 scheduling order.  (Doc. 26.)  Per the parties' joint request (Doc. 24 at 9), it set a deadline of April 15, 2020 for the completion of fact discovery.  However, at Dumont's unopposed request (Doc. 30), this deadline was later extended to June 15, 2020.  (Doc. 32.)

On June 29, 2020, after the discovery deadline had elapsed, Trelevate filed a motion for summary judgment.  (Doc. 35.)

On July 16, 2020, Dumont filed a motion to retroactively extend the expired

1    deadline for fact discovery.  (Doc. 36.)  After Trelevate filed an opposition (Doc. 39), this
2    request was denied (Doc. 41).

3         On August 28, 2020, Dumont filed a response to the summary judgment motion.
4    (Doc. 42.)

5         On September 11, 2020, Trelevate filed a reply.  (Doc. 45.)

6                                        **DISCUSSION**

7    I.    <u>Legal Standard</u>

8         A party moving for summary judgment "bears the initial responsibility of informing
9    the district court of the basis for its motion, and identifying those portions of 'the pleadings,
10   depositions, answers to interrogatories, and admissions on file, together with the affidavits,
11   if any,' which it believes demonstrate the absence of a genuine issue of material fact."
12   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of
13   production, the moving party must either produce evidence negating an essential element
14   of the nonmoving party's claim or defense or show that the nonmoving party does not have
15   enough evidence of an essential element to carry its ultimate burden of persuasion at trial."
16   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . .
17   [the] moving party carries its burden of production, the nonmoving party must produce
18   evidence to support its claim or defense."  *Id.* at 1103.

19        "Summary judgment is appropriate when 'there is no genuine dispute as to any
20   material fact and the movant is entitled to judgment as a matter of law.'"  *Rookaird v. BNSF*
21   *Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "A genuine
22   dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party
23   for a jury to return a verdict for that party.'"  *United States v. JP Morgan Chase Bank*
24   *Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $ 446,377.36*, 835 F.3d
25   1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-
26   50 (1986)).  The court "must view the evidence in the light most favorable to the
27   nonmoving party and draw all reasonable inference in the nonmoving party's favor."
28   *Rookaird*, 908 F.3d at 459.  Summary judgment is also appropriate against a party who

                                        - 4 -

"fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

II.   Analysis

A.   **Trelevate's Claim**

Trelevate moves for summary judgment on the sole claim in its complaint, which is that Dumont breached the Settlement Agreement by failing to make the $170,500 payment. (Doc. 35 at 10-11.)

Dumont responds that Trelevate's motion is procedurally improper because it was not accompanied by a separate statement of facts, as required by the local rules of the District of Arizona. (Doc. 42 at 7-8.) This argument is unavailing. The Rule 16 scheduling order in this case made clear that the local rules on this point were suspended and that a separate statement was not required. (Doc. 26 at 5-6.)

Dumont also contends that summary judgment should be denied because Trelevate "breached the Settlement Agreement first, which excused [Dumont] from any performance." (Doc. 42 at 8-12.) Dumont's theory is that because the Settlement Agreement provided that one of the parties' earlier contracts, the NDNS, would remain in full force and effect, "the terms of the NDNS were incorporated into the Settlement Agreement." (*Id.* at 9.) With this understanding in mind, Dumont argues that Trelevate violated the NDNS in two different ways, thereby excusing its obligation under the Settlement Agreement to make the $170,500 payment. (*Id.* at 9-12.) In reply, Trelevate doesn't seem to dispute Dumont's theory that the terms of the NDNS were implicitly incorporated into the Settlement Agreement but argues that the evidence proffered by Dumont fails to establish a material breach of the NDNS. (Doc. 45 at 7-11.)

Trelevate has the better side of this argument. Dumont sought to establish the alleged breaches of the NDNS via a declaration from its CEO, Daniel Piraino. (Doc. 44.) First, Mr. Piraino asserts that Trelevate breached the NDNS on August 2, 2019, when one of its employees sent an email to a Dumont client. (*Id.* ¶¶ 17-18.) According to Mr.

Piraino, this email violated the NDNS because it constituted the "use of [Dumont's] confidential customer information in soliciting a [Dumont] customer . . . not done on [Dumont's] behalf but on [Trelevate's] . . . behalf." (Doc. 44 ¶ 24.)  An initial problem with this argument is that Dumont does not explain how an email sent on August 2, 2019 could violate the Settlement Agreement, which was not executed until August 5, 2019.  A more fundamental problem is that Mr. Piraino's characterization of the email is inaccurate. In the actual email, the Trelevate employee simply wrote: "Just wanted to wish you a very happy Friday!!  Have a great weekend!"  (Doc. 42 at 39.)  Dumont makes no effort to explain how this innocuous email somehow constituted an impermissible attempt to solicit Dumont's customers.

The only other evidence in the summary judgment record on the issue of solicitation is a declaration from two of Trelevate's representatives, Paul Briski and Ryan Knauss, who avow that, since the execution of the Settlement Agreement, Trelevate "has not contracted to conduct business with and has not conducted business with any . . . Dumont customer or prospective customer" and "has not contacted any Dumont customer or lead other than to provide notification that Trelevate was no longer affiliated with Dumont and to direct any further inquiries to . . . Dumont."  (Doc. 35 at 17 ¶¶ 13-14.)  On this record, no reasonable factfinder could conclude that Trelevate violated the Settlement Agreement by impermissibly soliciting Dumont's customers.

The other theory of breach outlined in Mr. Piraino's declaration is that, on some unspecified date after July 16, 2019, Trelevate entered into an agreement with one of Dumont's "direct competitors," an aviation company called Alliance Aviation ("Alliance"), "to provide the very same services that [Trelevate] was providing to [Dumont]." (Doc. 44 ¶¶ 19-22.)  Additionally, Mr. Piraino asserts that several former Trelevate employees, who had access to Dumont's confidential information, have now been hired by Alliance.  (*Id.* ¶ 23.)  According to Dumont, these interactions between Trelevate and Alliance constitute further proof that the NDNS was violated.  (Doc. 42 at 10-12.)

- 6 -

This argument fails because it presumes that the NDNS included a non-compete clause.  But as the contract's acronym and text make clear, the contract only included prohibitions against the disclosure of Dumont's confidential information and against certain solicitation efforts.  (Doc. 42 at 19-22.)  There wasn't a non-compete provision (or else the contract would have been the "NDNSNC").  Thus, even accepting as true that Trelevate began working with one of Dumont's competitors after the parties' relationship fizzled and that some Trelevate employees were eventually hired by that competitor, such conduct would not violate the NDNS and thus would not excuse Dumont from its performance obligations under the Settlement Agreement.

In the final paragraph of its brief, Dumont makes a passing argument that the real problem with Trelevate's dealings with Alliance is "the fact that [Trelevate] entered into an agreement with [Dumont's] direct competitor, and that this direct competitor then hired several of [Trelevate's] employees, provides a strong inference that [Dumont's] confidential information was inevitably disclosed to a competitor." (Doc. 42 at 12.)  The difficulty with this argument is that Dumont has no *evidence* that its confidential or proprietary information was ever transmitted to Alliance.  The only evidence proffered by Dumont concerning the relationship between Trelevate and Alliance is Trelevate's response to Dumont's first set of interrogatories.  (Doc. 42 at 41-54.)  In that document, Trelevate explained that it merely entered into a non-disclosure agreement with Alliance "to facilitate discussions regarding a *prospective* business relationship" and ultimately "elected not elected not to continue its preliminary discussions with Alliance and did not enter into any Statement of Work agreements with Alliance"; that it "undertook . . . measures . . . to ensure that no confidential information of [Dumont] or proprietary information of [Dumont] was shared with Alliance"; and that it "verified in writing, signed by each Trelevate former employee, that no confidential or proprietary information of [Dumont] was taken when they left Trelevate's employment." (*Id.* at 48, 50, emphasis added.)  In other words, the evidence proffered by Dumont undermines, rather than supports, its allegation that Trelevate violated the NDNS by disclosing confidential

1    information to Alliance.[1]

2        On this record, Dumont has not established that Trelevate committed a material

3    breach of the NDNS that would excuse Dumont's obligation under the Settlement

4    Agreement to make the $170,500 payment.  Because Dumont does not offer any other

5    reasons for avoiding summary judgment on Trelevate's breach-of-contract claim,

6    Trelevate's motion for summary judgment on that claim will be granted.

7        **B.    Dumont's Counterclaims**

8        Dumont has asserted four counterclaims against Trelevate.  (Doc. 13.)  Count One

9    is for breach of contract, Count Two is for unjust enrichment, Count Three is for tortious

10   interference, and Count Four is for breach of the implied covenant of good faith and fair

11   dealing.  (*Id.* at 4-9.)  The theory underlying all of these counterclaims is that Trelevate

12   violated the NDNS and Settlement Agreement by "surreptitiously utiliz[ing] [Dumont's]

13   proprietary and confidential business information and trade secrets for [Trelevate's] own

14   use and to assist a competitor of [Dumont]" and by "improperly and unlawfully

15   contact[ing] [Dumont's] customers and leads in order to generate business for [Dumont's]

16   competitor."  (*Id.* at 5-6 ¶¶ 9-10.)

17       Trelevate moves for summary judgment on all four counterclaims.  (Doc. 35 at 11-

18   14.)  It argues that Dumont cannot establish the essential elements of any counterclaim and

19   also identifies additional reasons why the unjust enrichment and implied covenant claims

20   are not cognizable.  (*Id.*)

21       In its response, Dumont barely mentions its counterclaims.  The only counterclaim

22   that is specifically discussed is Count Three (tortious interference) and Dumont's only

23   argument is that the evidence it proffered to defeat summary judgment on Trelevate's

24   breach-of-contract claim (*i.e.,* the August 2, 2019 email and Trelevate's dealings with

25   Alliance) is also sufficient to "demonstrate that [Dumont] has established its tortious

26

27   ---
     [1]    The evidence proffered by Trelevate is no different.  (Doc. 35 at 17 [declaration
28   avowing that, since the execution of the Settlement Agreement, Trelevate "has not
     disclosed any trade secrets of Dumont" and has not "used . . . or disclosed any confidential
     information of Dumont"].)

1    interference claim."  (Doc. 42 at 10-11.)

2        Trelevate is entitled to summary judgment on all of Dumont's counterclaims.  Those

3    claims are predicated on the notion that Trelevate improperly solicited Dumont's customers

4    and improperly disclosed Dumont's confidential and proprietary information, but as

5    discussed in Part II.A above, there is simply no evidence of such misconduct.  Additionally,

6    Dumont has made no effort to establish its alleged damages.  *Chartone, Inc. v. Bernini*, 83

7    P.3d 1103, 1111 (Ariz. Ct. App. 2004) ("damages [are] an essential element of their breach-

8    of-contract claim"); *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of*

9    *Governors*, 909 P.2d 486, 494 (Ariz. Ct. App. 1995) ("To establish a *prima facie* case of

10   intentional interference with contractual relations, a plaintiff must prove . . . resultant

11   damage to the party whose relationship or expectancy has been disrupted.").

12       Accordingly,

13       **IT IS ORDERED** that:

14       (1)    Trelevate's motion for summary judgment (Doc. 35) is **granted**.

15       (2)    The Clerk of Court shall enter judgment accordingly and terminate this

16   action.

17       Dated this 10th day of December, 2020.

Dominic W. Lanza
United States District Judge

- 9 -